23-CV-6736-EAW

## VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Petitioner, **Cheikh Diakhate**, hereby petitions this Court for a writ of

Habeas Corpus to remedy his unlawful detention, and to enjoin continued

unlawful detention by the Respondents. In support of this petition and complaint

for injunctive relief, Petitioner alleges as follows:

*UNITED STATES DISTRICT COURT*
*FILED*
*DEC 2 7 2023*
*MARY C. LOEWENGUTH, CLERK*
*WESTERN DISTRICT OF NY*

### CUSTODY

1. Petitioner is in physical custody of Respondents and U.S. Immigration and

customs Enforcement ("ICE"). Petitioner is detained at the Buffalo Federal

Detention Facility, 4250 Federal Drive, Batavia, N. Y. 14020. Petitioner is under

the direct control of respondents and their agents. Petitioner currently has an

appeal pending at the Board of Immigration Appeals. Petitioner has been in

DHS/ICE custody since around June 24, 2022.

### JURISDICTION

**2.** This actions arises under the Constitution of the United States and the

Immigration and Nationality Act, ("INA"), 8 U.S.C. § 1101 et seq., and the

Administrative Procedure Act, ("APA"), 5 U.S.C. § 701 et seq.

**3.** This Court has jurisdiction under 28 U.S.C. § 2241; Art. I § 9, cl. 2 of the United States Constitution (Suspension Clause) and 28 U.S.C. § 1331, as Petitioner is presently in custody under color of authority of the United States, and such custody is in violation of the Constitution, laws, or treaties of the United States. This Court may grant relief pursuant to 28 U.S.C. § 2241; 5 U.S.C. § 702, and the All Writs Act, 28 U.S.C. § 1651.

## VENUE

**4.** Pursuant to Braden v. 30th. Judicial Circuit Court of Kentucky, 410 U.S. 484, 493-500(1973), venue lies in the United States district Court for the Western District of New York, the judicial district where Petitioner is currently in custody.

## PARTIES

**5.** Petitioner, **Cheikh Diakhate**, is a citizen and native of **Senegal**. Petitioner has resided in this country since August 14, 1994. Petitioner is a layman, untrained in the law, with additional barriers of a limited knowledge and applicability in the English language, compounded by a like handicap as to immigration law, statutes, and procedures.


**6.** Respondent Jeffrey Searls is the Facility Director of the Buffalo Federal Detention Facility. As such, he is Petitioner's legal custodian charged with the responsibility of determining whether Petitioner will be detained in ICE custody or

observed about 400 detainees, of which only about 5 are "whites"—citizens of

Western Europe, Canada, Australia, New Zealand, and/or Scandinavia

(**WECANZS**). Clearly, DHS/ICE detention has a disparate impact on Africa Mexico,

Majority Muslim, Latin, America, the Caribbean and Communist Controlled

(**AMMMLACCC**) country citizens. This is a situation where disparate impact alone

is determinative because the circumstances are not ""[a]bsent a pattern as stark

as that in *Gomillion* or *Yick Wo*, [[such that] disparate] impact alone is not

determinative."" In *United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032; 2022

U.S. Dist. LEXIS 29868, the legal standard is set as:

"II. LEGAL STANDARD
The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." Although the Fifth Amendment does not contain an equal protection clause similar to the Fourteenth Amendment, "the concepts of equal protection and due process, stemming from our American ideal of fairness, are not mutually exclusive." *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S. Ct. 693, 98 L. Ed. 884 (1964). Accordingly, **the equal protection analysis implicit in the Fifth Amendment "is the same as that under the Fourteenth Amendment.**" *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976). **Challenges to official action or facially neutral laws for violation of the Equal Protection Clause require proof** {2022 U.S. Dist. LEXIS 14} **that a "racially discriminatory intent or purpose" served as "a motivating factor in the decision" or law being challenged.** *Arlington Heights*, 429 U.S. at 265-66.
Courts will not "strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968). Recognition that "legislators and administrators are properly concerned with balancing numerous competing considerations" encourages courts to "refrain from reviewing the merits of [congressional or administrative] decisions, **absent a showing of arbitrariness** or irrationality." *Arlington Heights*, 429 U.S. at 265. **Racial discrimination, however, "is not just another competing consideration" and "proof that a discriminatory purpose has been a motivating factor" in the challenged government action eliminates the justification for "judicial deference."** *Id*. at 265-66. In *Arlington Heights*, the Supreme Court established certain non-exhaustive factors to guide the "sensitive inquiry" into whether a challenged government action was motivated by an "invidious discriminatory purpose." *Id*. at 266. These factors include **(1) the disparate "impact of the official action"; (2) the "historical background of the decision"; (3) the "sequence of events leading up to the challenged decision"; (4) any procedural or** {2022 U.S. Dist. LEXIS 15} **substantive departures;**

released pending the conclusion of immigration removal proceedings.

**A. Is the DHS/ICE Discriminating Against Cheikh Diakhate As a Part of A Pattern and Practice?**:
**The Legal Standard For Discrimination On The Basis of Nationality or Race**:
Cheikh Diakhate alleges that during his time in immigration detention he has

and (5) the relevant "legislative or administrative history." *Id.* at 266-68. No single *Arlington Heights* factor is individually dispositive. *Id.* at 268. **The party asserting that a "law was enacted with discriminatory intent" carries the burden of proof.** *Abbott v. Perez,* U.S. , 138 S. Ct. 2305, 2324, 201 L. Ed. 2d 714 (2018). **Satisfaction of that burden shifts the burden to the Government to establish "that the same decision would have resulted even had the impermissible purpose not been considered."** *Arlington Heights*, 429 U.S. at 270 n.21.12 "The allocation of the {586 F. Supp. 3d 1042} burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Abbott*, 138 S. Ct. at 2324."

However, with a pattern as stark as that in *Yick Wo*, the legal standard converges to that set out in the quote following this paragraph. The fact that 99% of all persons detained by the DHS/ICE are from AMMMLACCC heritage "demonstrate an invidious discriminatory purpose" and attracts the holding in *Yick Wo*, as described in *Muñoz-De La O*, which states:

"Defendant argues that § 1326 disparately impacts Latinxs and cites two recent district court cases holding the same. ECF No. 61 at 8 (citing *Carrillo-Lopez*, 2021 U.S. Dist. LEXIS 155741, 2021 WL 3667330, at *6-7; *Machic-Xiap*, 2021 U.S. Dist. LEXIS 145037, 2021 WL 3362738, at *10). The Supreme Court has rejected the notion that "a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional solely because it has a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976). However, **the Court recognized exceptions where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."** *Arlington Heights*, 429 U.S. at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125, 5 L. Ed. 2d 110 (1960)).
In *Yick Wo*, the Court considered a San Francisco ordinance that made it illegal to operate a laundry facility in a wooden building without a permit. 6 S. Ct. at 1065. **Although racially neutral on its face, the Court held that the law was unconstitutional because "[t]he necessary tendency, if not the specific purpose, of this ordinance . . . is to drive out of business all the numerous small laundries, especially those owned by Chinese [individuals]."** *Id.* at 1068. In *Gomillion*, petitioners challenged the validity of an Alabama law that redefined the boundaries of the City of Tuskegee. 364 U.S. at 340. The Court reversed {2022 U.S. Dist. LEXIS 23} the lower courts, thereby allowing the equal protection claim to proceed to trial, **given that the "inevitable effect of this redefinition of Tuskegee's boundaries is to remove from the city all save four or five of its 400 Negro voters while not removing a single white voter or resident."** *Id.* at 341. "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, [disparate] impact alone is

not determinative." **Arlington Heights**, 429 U.S. at 266.

The Supreme Court recently considered a disparate impact argument as part of a constitutional challenge to the recission of the Deferred Action for Childhood Arrivals ("DACA") program. See **Department of Homeland Security v. Regents of the University of California**, U.S. , 140 S. Ct. 1891, 1915, 207 L. Ed. 2d 353 (2020) (ruling that the respondents' argument that the rescission of DACA disparately impacted "Latinos from Mexico, who represent 78% of DACA recipients" was insufficient, to establish an equal protection violation). There, the Court noted that alleged disparate impact alone did not demonstrate an invidious discriminatory purpose {586 F. Supp. 3d 1046} because otherwise, "virtually any generally applicable immigration policy could be challenged on equal protection grounds." Id. at 1916."

Cheikh Diakhate alleges that his classification as a citizen of Jamaica by the DHS/ICE puts him squarely in a class of persons whose Equal Protection Clause rights the DHS/ICE has violated in the application of the immigration laws. That is, Jamaica is a member of the group of countries referred to as AMMMLACCC countries. For those looking through a global economic prism, AMMMLACCC is the equivalent of the International South of Africa, Asia, the Americas and Communist (**ISAAAC**) countries. For completeness, the comparison group to AMMMLACCC is Western Europe, Canada, Australia, New Zealend and Scandinavia (WECANZS). Where "[.]" incorporates all subparts of a listed statute, Cheikh Diakhate alleges that 8 U.S.C. §§ 1229a[.], 1226[.], 1231[.], and /or 1357 (a); and/or 8 CFR §§ 287[.] are unconstituional on their face or as applied. In essence, **the DHS/ICE, and associated agencies, who enforce and adjudicate immigration laws, especially the ones listed in the last sentence, are saying "yes**

we can" **accommodate persons from predominantly white countries who are**

**not communist, but we have to detain and deport non-whites**. Evidence and

argument in support of these claims are found in the supporting Bill of Particulars

on Discrimination (BoPD) submitted with this brief.

Said BoPD highlights the situations of Jose Francisco Tineo, Luis Ramon Morales-

Santana, Duarte-Ceri, Wayne D. Gray, Michael Robinson; Davino Watson;

Mohammed Darwish; and Kendrick Foncette; among others. In ***Dixon v. De***

***Blasio***, 566 F. Supp. 3d 171; 2021 U.S. Dist. LEXIS 196287, the CA2 states:

> "I. Equal Protection
> Plaintiffs' equal protection claim fails because they have not shown that the {566 F.
> Supp. 3d 180} EEOs target a protected class, are the result of animus, or are not
> rationally related to a legitimate government interest. **Unless a statute or state action
> provokes "strict judicial scrutiny because it** interferes with a fundamental right **or
> discriminates against a suspect class, it will ordinarily survive an equal protection
> attack so long as the challenged classification is rationally related to a legitimate
> governmental purpose."** *KaxxxCheikh Diakhatexxxmas v. Dickinson Pub. Sch.*, 487 U.S.
> 450, 457-58, 108 S. Ct. 2481, 101 L. Ed. 2d 399 (1988) (internal quotes and citations
> omitted).
> **To demonstrate an equal protection violation, plaintiffs must show that a government
> actor intentionally discriminated against them based on their race, national origin, or
> gender. Such intentional discrimination can be demonstrated in several ways.** First,
> the law or policy can be discriminatory on its face if it expressly classifies persons
> because of race, national origin, or gender. See *Hayden v. Cnty. of Nassau*, 180 F.3d 42,
> 48 (2d Cir. 1999). In addition, **a law which is facially neutral violates** {2021 U.S. Dist.
> LEXIS 9} **equal protection if it is applied in a discriminatory fashion**. *Id*. (citing *Yick Wo
> v. Hopkins*, 118 U.S. 356, 373-74, 6 S. Ct. 1064, 30 L. Ed. 220 (1886)). Lastly, **a facially
> neutral statute violates equal protection if it is motivated by discriminatory animus
> and its application results in a discriminatory effect.** See *Vill. of Arlington Heights v.
> Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977)."

The BoPD clearly shows the discriminatory effect or practices in the enforcement and adjudication of the immigration laws. The BoPD highlights that U.S. citizens with AMMMLACCC heritage are routinely deported by the DHS/ICE. See ***Gray v. Weselmann***, 274 F. Supp. 3d 81; 2017 U.S. Dist. LEXIS 48451, citing a book by Jacqueline Stevens. In ***Gray v. Weselmann*** the court writes "**It is frightening to think that our Government may mistakenly deport people who are actually U.S. citizens. It is frightening but not unheard of**. See Jacqueline Stevens, <u>U.S. Government Unlawfully Detaining and Deporting U.S. Citizens as Aliens</u>, 18 Va. J. Soc. Pol'y & L. 606 (2011) (empirical study of incidence of wrongful removal of U.S. citizens)." Clearly, the DHS/ICE has no authority to deport U.S. citizens. This pattern and practice of deporting U.S. citizens simply because they possess AMMMLACCC family heritage is not a mistake, and is such that "**the Court recognized exceptions where "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face**." Even if the laws Cheikh Diakhate alleges are unconstitutional are neutral on their face, each of them is unconstitutional "**because "[t]he necessary tendency, if not the specific purpose, of this ordinance . . . is to drive out of** ~~business all the numerous small laundries, especially those owned by Chinese [individuals]~~ **the U.S. persons with**

AMMMLACC heritage, and to encourage those with WECANZS heritage to come
and live in the U.S.""

To the extent that 8 U.S.C. §§ 1229a[.], 1357a, 1226[.] and/or 1231[.] can be

interpreted such that they lead to the absurd result which allows for the

commencement and carrying on with removal proceddings; promotes or prolongs

detention of AMMMLACC citizens while WECANZS citizens are not subjected to

the removal proceedings and/or detention under similar circumstances, 1229a[.],

1357a, 1226 and/or 1231 are unconstitutional as applied or on their face? If these

laws are not unconstitutional under an interpretation which seeks to deport or

incarcerates AMMLACCC citizens but does not do the same to similarly situated

WECANZ citizens, then it implies an absurd and unreasonable outcome which

implicates a Kafkaesque sense of AMMMLACCC citizens' right to liberty, with

further absurdity or unreasonableness amounting to discrimination based on

nationality or race. See *Dent v. Holder*. Furthermore, immigration detention of

AMMMLACCC citizens based solely on completed criminal sentences or visa

overstays, amounts to admitting that the rehabilitative purpose of the prison

system has failed for AMMMLACCC citizens but not for WECANZS citizens. This is

an absurd result such that release of persons who are WECANZS citizens is a

constitutionally impermissible discrimination on the basis of nationality or race.

See *United States v. Jacobson*, 15. F. 3d. 19. That is, where two persons who

commit the same (or a similar) crime and spend the same (or a similar) time in the

same (or a similar) prison facility for having committed that crime, where one

such person is a WECANZS citizen, and the other is not, the discrimination based

on nationality or race is patent. That is, where the AMMMLACCC citizen is held in

immigration detention on a claim that said AMMMLACCC citizen is a threat to

public safety and the WECANZS citizen is released into the community, such

detention is based entirely on race or nationality. In effect, said detention

amounts to incarceration in an amount of time over and above the amount of

time the WECANZS citizen is incarcerated exactly on the basis of nationality or

race. This kind of incarceration is proscribed by the holding in *Jacobson*. As such,

for the purposes of release under immigration law, the only consideration which

can be deemed to be constitutional are considerations of whether "aliens" who

commit crimes and serve their sentences are a flight risk.

Furthermore, 1229a[.], 1357a, 1226[.] and/or 1231[.] are unconstitutional in so

far as they speak to flight risk, but allow WECANZS citizens to be released on

parole or probabtion, while AMMMLACCC citizens are incarcerated by the

DHS/ICE on grounds that AMMMLACCC citizens are a flight risk. Again, comparing

a WECANZS citizen to an AMMMLACCC citizen in circumstances similar to that

described at the last item results in the same kind of unconstitutionality, with the

same legal support. That is, where a WECANZS citizen goes home on probation or

parole but the AMMMLACCC citizen goes into DHS/ICE custody, the only

distinction between the WECANZ citizen and the AMMMLACCC citizen is race or

nationality. This is clearly inconsistent with the Equal Protection Clause.

The Discriminatory motive of the 1950's Congress is clearly expressed in the

statement:

> "In the ensuing years, Congress held hearings on the "eugenical aspects of deportation"4
> that described deportation as **the last line of defense against contamination** {586 F. Supp.
> 3d 1037} **of American family stocks by alien hereditary degeneracy**." ECF No. 61-4 at 6.
> During a separate congressional hearing, Congressman Box stated that "[t]he admission of
> a large and increasing number {2022 U.S. Dist. LEXIS 5} of Mexican peons to engage in all
> kinds of work is at variance with the American purpose to protect the wages of its working
> people." ECF No. 61-6 at 2. **Congressman Box argued that the presence of Mexican
> immigrants destroyed "schools, churches, and all good community life" for white
> Americans.** Id.
> ...
> In summarizing the history surrounding § 1326 as well {2022 U.S. Dist. LEXIS 10} as the
> entirety of the 1952 INA, Professor Kang argues that "both congressional conservatives and
> liberals played an active and deliberate role in extending the racism that inhered in the
> nation's immigration laws via the passage of the [1952 INA]." Id. at 24. **On June 25, 1952,
> President Truman vetoed the Congressional bill, citing a number of concerns with the
> proposed law. Chief among them was that "[t]he bill would continue, practically without
> change, the national origins quota system."** ECF No. 61-15 at 4. **President Truman noted
> that the quota system "discriminates deliberately and intentionally, against many of the
> peoples of the world."** Id. 11 He observed that "[s]eldom has a bill exhibited the distrust
> evidenced here for citizens and aliens alike at a time when we need unity at home, and the
> confidence of our friends abroad." ECF No. 61-15 at 7.

> {586 F. Supp. 3d 1040} **President Truman also compared the bill to the "infamous Alien
> Act of 1798, passed in a time of national fear and distrust of foreigners, which gave the
> President the power to deport any alien deemed 'dangerous to the peace and safety of**

the United States.'" *Id*. at 8-9. Despite these misgivings, **Congress overrode the presidential veto,** {2022 U.S. Dist. LEXIS 11} **and the law went into effect on June 27, 1952**."

In *Aqua Harvesters v. New York State Department Of Environmental*

*Conservation*, 399 F. Supp. 3d 15; 2019 U.S. Dist. LEXIS 115812; 2019 AMC

19362019 AMC 1936, the CA2 made clear that a law that disprotionately affects a

certain group violates the Equal Protection Clause and is subject to heightened

scrutiny by stating:

> "Although **a finding that a law is clearly discriminatory subjects it to heightened scrutiny**, the Supreme Court has "acknowledged, however, that 'there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102 (2d Cir. 2003) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth*., 476 U.S. 573, 579, 106 S. Ct. 2080, 90 L. Ed. 2d 552 (1986)). Thus, for example, **although "[e]ven facially neutral statutory provisions can be discriminatory 'in practical effect,'"** *Atlantic Prince, Ltd. v. Jorling*, 710 F. Supp. 893, 896 (E.D.N.Y. 1989), **it is often far from obvious when alleged discriminatory effects warrant** {2019 U.S. Dist. LEXIS 85} **heightened scrutiny**. Compare, e.g, *id*. (**finding that New York statute barring fishing vessels over 90 feet in length had both a discriminatory purpose and discriminated "in practical effect" because it bore "disproportionately" on out-of-state fishermen as, at most, only one New York fishing vessel was adversely affected by the statute, but ten out-of-state vessels that sought to fish in New York were excluded by the statute's length restriction**) 37 with {399 F. Supp. 3d 58} *Davrod*, 971 F.2d 778, 787-91 (1st Cir. 1992) (finding Massachusetts regulation that excluded fishing vessels over 90 feet long-which New York's statute was modeled on-did not discriminate "in practical effect" because, generally, "Massachusetts fishing vessels longer than ninety feet greatly outnumber out-of-state vessels" and even though all of the over-90-foot vessels that were equipped for squid fishing were from out of state, there were over-90-foot Massachusetts vessels which, although not presently equipped for squid fishing, "could be converted to squid fishing"); *Davrod*, 971 F.2d at 796 (Coffin, J., dissenting in part) (asserting that the majority erred in analyzing discriminatory effect by not focusing on the impact of the statute on a "particular class of out-of-state interests-squid freezer-trawlers {2019 U.S. Dist. LEXIS 86} such as plaintiffs"); cf. Allco Fin., 861 F.3d at 103 ("[A] ny notion of discrimination assumes a comparison of substantially similar entities."

and was distinct from the historical discrimination against Asians. Footnotes 3-4

and 9-11 of ***Muñoz-De La O*** States:

"**Footnote 3**:
**Immigrants from the following nations were excluded from the quota system: Canada,
Newfoundland, Mexico, Cuba, Haiti, the Jamaica, the Canal Zone, or an independent
country of Central or South America**. Immigration Act of 1924 §4(c). Moreover, **the law
prohibited the admission of aliens "ineligible to citizenship," which excluded Asian
immigrants based on prior laws such as the 1882 Chinese Exclusion Act.** *Id.* at §§ 2(a), 5.
**Immigration quotas were not "allotted to any African countries under the Act because
immigrant visas were allocated solely based on the nation's white population." Unfit for
the Constitution: Nativism and the Constitution, from the Founding Fathers to Donald
Trump, Jared A. Goldstein**, 20 U. Pa. J. Const. L. 489, 525 n.219 (2018).
**Footnote 4**:
As one academic has observed, **"Eugenicists argued that intelligence was genetically
determined, and consequently, transmittable from parent to child."** Khiara M. Bridges,
**White Privilege and White Disadvantage**, 105 **Virginia L. Rev.** 449, 462 (2019). **In order to
further the goal of creating "an American society in which the population had nothing but
advantageous genes running through its veins[,]" Eugenicists utilized several tactics,
including encouraging "the right immigrants to enter the country" from Scandinavian
countries while "preventing the same from the wrong immigrants" who hailed from non-
white countries**. *Id.* at 463.
**Footnote 9**:
**The 1952 INA also is referred to as the McCarran-Walter Act after its congressional
sponsors**, Senator Pat McCarran and Representative Francis Walter.
**Footnote 10**:
**Professor Kang also points to comments made by Senator McCarran during two
appropriations hearings that occurred one year before and after the 1952 INA became
law.** ECF No. 78-2 at 19. **In 1951, Senator McCarran described the "flood of people" who
come across the border, legally or illegally, as "wet-backs"** who engage in "come-and go
drifting" between Mexico and the United States during various harvest seasons. ECF No. 78-
7 at 4 (Hearing on Deportation of Mexicans Before the Subcomm. on Appropriations, 82nd
Cong. 124 (1951)). **During a 1953 appropriations hearing, Senator McCarran stated that
southwestern growers could not "get along without" Mexican farm labor, noting that "on
this side of the border there is a desire for these wetbacks."** ECF No. 78-6 at 31-32
(Hearing on H.R. 4974 Before the Subcomm. on Appropriations, 83rd Cong. 245-46 (1953)).
When responding to concerns that the Bracero Program required bracero workers to be
fed, paid minimum wages, and given health insurance, **Senator McCarran responded that
"[t]he wetback is little interested in that sort of thing**. In other words, **a farmer can get a
wetback and he does not have to go through that red tape."** Id. at 32.
Footnote 11:

(quoting *GMC v. Tracy*, 519 U.S. 278, 298-99, 117 S. Ct. 811, 136 L. Ed. 2d 761 (1997)))."

Cheikh Diakhate alleges that, at least in its application, the INA violates the Equal

Protection Clause because it discriminates against persons with AMMMLACCC

country heritage. In Cheikh Diakhate's own observation in the time he has been

detainmed by the DHS/ICE at the BFDF he has shared a housing unit with

cumulatively about 1200 persons. About 1191 of those persons, roughly 99 per

cent, are from AMMMLACCC. That is, **the DHS/ICE's disparate treatment in**

**detention and deportation of AMMMLACCC citizens, in comparison to**

**WECANZS citizens, in claimed enforcement and adjudication of the immigration**

**laws** is anachronistic. Furthermore, the INA maintains the discriminatory animus

of the Undersirable Aliens Act (UAA) of the 1920s, and its amendments which

resulted in the 1952 Immigration and Nationality Act (INA), which was branded by

Congress in the 1950s as the "wet-back law." Importantly, the President vetoed

the wet-back law, but as a demonstration as an act of the "whole of Congress,"

the 1952 Congress by a 'super-majority' overruled the President's veto. It is to be

noted that the 1952 law survived scrutiny as set out in footnotes 4 and 11 of

*United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032; 2022 U.S. Dist. LEXIS

29868, because it was claimed that the disrimination at issue targeted Mexicans

President Truman's remarks about the bill's deliberate and intentional discrimination mostly center on the President's qualms with the historical treatment of Asian, not Hispanic, individuals in United States immigration policy. See ECF No. 61-15 at 11 (urging Congress "to enact legislation removing the racial barriers against Asians from our laws")."

Footnotes 9 and 10 of *Muñoz-De La O* make the intention's of the Bill's sponsor, Congressman McCarran, abundantly clear. When Congress voted to overrule President Truman's veto, the whole of Congress supported Congressman McCarran's view. Any view that a two-third majority or more of Congress does not represent the view of the "whole of Congress" is simply absurd in a democracy. Indeed, laws are typically passed on a simple majority, meaning 50 per cent. As such, two-thirds should be considered an **extreme-majority** or a **super-majority**. In fact, the clear discrimination against persons from Caribbean countries with significant black populations, such that persons from the Jamaica are being discriminated against evidences that today's enforcement and adjudication of the immigration laws reflect race-based animus that is even deeper than the animus expressed by Congressman McCarran and the whole of Congress, via the overruling of President Truman's veto.

Strict scrutiny is applied to Equal Protection Clause claims, as outlined in *Gary B. et al. v. Whitmer*, 957 F.3d 616; 2020 U.S. App. LEXIS 13110; 2020 FED App 0124P,

which states:

"1. Equal Protection Framework
**"When a state distributes benefits unequally, the distinctions it makes {957 F.3d 634}
are subject to scrutiny under the Equal Protection Clause of the Fourteenth
Amendment."** *Zobel v. Williams*, 457 U.S. 55, 60, 102 S. Ct. 2309, 72 L. Ed. 2d 672
(1982). **At its core, the Clause says that "all persons similarly situated should be
treated alike."** *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct.
3249, 87 L. Ed. 2d 313 (1985). Thus, **plaintiffs alleging an equal protection claim have
to make two showings: first, that the defendants treated them differently from other
similarly situated persons, and second, that this difference in treatment is not
supported by a sufficiently strong governmental** {2020 U.S. App. LEXIS 37} **interest**.
E.g., id. at 439-40; *Jolivette v. Husted*, 694 F.3d 760, 771 (6th Cir. 2012); Ctr. for Bio-
Ethical Reform, Inc. v. Napolitano, 648 F.3d 365, 379 (6th Cir. 2011); Scarbrough v.
Morgan Cty. Bd. of Educ., 470 F.3d 250, 260 (6th Cir. 2006).
Much of the Supreme Court's equal protection case law concerns the second part of
this test, and specifically how strong the governmental interest must be. For example, **if
a government policy discriminates based on race or another immutable, protected
characteristic, the Court applies "strict scrutiny" and will uphold the policy only if it
furthers a "compelling state interest" and is narrowly tailored in doing so.** *Cleburne*,
473 U.S. at 440; accord, e.g., *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S. Ct. 2325,
156 L. Ed. 2d 304 (2003); see also, e.g., *Zablocki v. Redhail*, 434 U.S. 374, 388, 98 S. Ct.
673, 54 L. Ed. 2d 618 (1978) (also applying strict scrutiny "[w]hen a statutory
classification significantly interferes with the exercise of a fundamental right").9
**On the other hand, if the policy does not concern a protected class, "rational basis"
review is used, and the policy will be sustained if it "is rationally related to a
legitimate state interest".** *Cleburne*, 473 U.S. at 440. This rational basis standard is
extremely forgiving. The challenged action is presumed to be constitutional, and the
burden is on Plaintiffs to negate "every conceivable basis" that might support it. *Heller
v. Doe ex rel. Doe*, 509 U.S. 312, 320, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) (quoting
*Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S. Ct. 1001, 35 L. Ed. 2d
351 (1973)). Further, "[w]hen social or economic legislation is at issue, the Equal
Protection Clause allows the States wide latitude." *Cleburne*, 473 U.S. at 440."

Cheikh Diakhate can meet the burden of proving an Equal Protection Clause

violation. Firstly, the historical underpinnings of the UAA and the "wet-back law,"

together with AMMMLACCC citizens accounting for 99 per cent of persons held in

*Reed*, 404 U. S. 71, 74, 76-77, 92 S. Ct. 251, 30 L. Ed. 2d 225; *Frontiero v. Richardson*, 411 U. S. 677, 688-691, 93 S. Ct. 1764, 36 L. Ed. 2d 583; *Weinberger v. Wiesenfeld*, 420 U. S. 636, 648-653, 95 S. Ct. 1225, 43 L. Ed. 2d 514; and *Califano v. Goldfarb*, 430 U. S. 199, 206-207, 97 S. Ct. 1021, 51 L. Ed. 2d 270. A successful defense therefore requires an `` 'exceedingly persuasive justification.' " *United States v. Virginia*, 518 U. S. 515, 531, 116 S. Ct. 2264, 135 L. Ed. 2d 735. Pp. ___ - ___, 198 L. Ed. 2d, at 162-163.

(c) **The Government must show**, at least, **that its** gender-based `` 'classification serves ``important governmental objectives and that the discriminatory means employed" are ``substantially related to [achieving] those objectives**." ' " *Virginia*, 518 U. S., at 533, 116 S. Ct. 2264, 135 L. Ed. 2d 735. **The classification must serve an important governmental interest today**, for ``new insights and societal understandings can reveal unjustified inequality . . . that once passed unnoticed and unchallenged." *Obergefell v. Hodges*, 576 U. S. ___, ___, 135 S. Ct. 2584, 192 L. Ed. 2d 609. Pp. ___ - ___, 198 L. Ed. 2d, at 163-166.

(1) At the time §1409 was enacted as part of the Nationality Act of 1940 (1940 Act), **two once habitual, but now untenable, assumptions pervaded the Nation's citizenship laws and underpinned judicial and administrative rulings**: In marriage, husband is dominant, wife subordinate; unwed mother is the sole guardian of a nonmarital child. In the 1940 Act, Congress codified the mother-as-sole-guardian perception for unmarried parents. According to the stereotype, a residency requirement was justified for unwed citizen fathers, who would care little about, and have scant contact with, their nonmarital children. Unwed citizen {2017 U.S. LEXIS 5} mothers needed no such prophylactic, because the alien father, along with his foreign ways, was presumptively out of the picture. Pp. ___ - ___, 198 L. Ed. 2d, at 163-165.

(2) **For close to a half century, this Court has viewed with suspicion laws {198 L. Ed. 2d 157} that rely on ``overbroad generalizations about the different talents, capacities, or preferences of males and females."** *Virginia*, 518 U. S., at 533, 116 S. Ct. 2264, 135 L. Ed. 2d 735. No ``important [governmental] interest" is served by laws grounded, as §1409(a) and (c) are, in the obsolescing view that ``unwed fathers [are] invariably less qualified and entitled than mothers" to take responsibility for nonmarital children. *Caban v. Mohammed*, 441 U. S. 380, 382, 394, 99 S. Ct. 1760, 60 L. Ed. 2d 297. In light of this equal protection jurisprudence, §1409(a) and (c)s discrete duration-of-residence requirements for mothers and fathers [**the DHS/ICE's disparate treatment in detention and deportation of AMMMLACCC citizens, in comparison to WECANZS citizens, in enforcement and adjudication of the immigration laws**] are anachronistic. Pp. ___ - ___, 198 L. Ed. 2d, at 165-166.

(d) The Government points to *Fiallo v. Bell,* 430 U. S. 787, 97 S. Ct. 1473, 52 L. Ed. 2d 50; *Miller v. Albright*, 523 U. S. 420, 118 S. Ct. 1428, 140 L. Ed. 2d 575; and *Nguyen v. INS*, 533 U. S. 53, 121 S. Ct. 2053, 150 L. Ed. 2d 115, for support. **But *Fiallo* involved entry preferences for alien children; the case did not present a claim of U.S. citizenship.** And *Miller* and *Nguyen* addressed a paternal-acknowledgment requirement well met here, not the length of a parent's prebirth residency in the United States. Pp. ___ - ___, 198 L. Ed. 2d, at 166-168.

(e) The Government's suggested rationales for §1409(a) and (c)s gender-based differential do not survive heightened scrutiny. Pp. ___ - ___, 198 L. Ed. 2d, at 168-171."

DHS/ICE detention, are clear evidence that AMMMLACCC citizens are treated differently in comparison to WECANZS citizens. Secondly, there can be no governmental interests in detaining and/or deporting almost entirely AMMMLACCC citizens, including AMMMLACCC citizens who are also U.S. citizens. Since visa violation rates or criminal convictions among persons who are not U.S. citizens does not have 99 per cent of its total attributable to AMMMLACCC citizens, it is clear that there is discrimination at work in the enforcement and adjudication of the immigration laws.

In *Sessions v. Morales-Santana*, 137 S Ct 1678137 S. Ct. 1678; 198 L Ed 2d 150198 L. Ed. 2d 150; 2017 US LEXIS 37242017 U.S. LEXIS 3724; 85 USLW 433785 U.S.L.W. 4337; 26 Fla L Weekly Fed S 64626 Fla. L. Weekly Fed. S 646

No. 15-1191, SCOTUS states:

"1. The gender line Congress drew is incompatible with the Fifth Amendments requirement that the Government {198 L. Ed. 2d 156} accord to all persons ``the equal protection of the laws." Pp. ___ - ___, 198 L. Ed. 2d, at 161-171.
(a) **Morales-Santana satisfies the requirements for third-party standing in seeking to vindicate his father's right to equal protection.** José Morales' ability to pass citizenship to his son easily satisfies the requirement that the third party have a `` 'close' relationship with the person who possesses the right." *Kowalski v. Tesmer*, 543 U. S. 125, 130, 125 S. Ct. 564, 160 L. Ed. 2d 519. And José's death many years before the current controversy arose is ``a 'hindrance' to [José's] ability to protect his own interests." Ibid. Pp. ___ - ___, 198 L. Ed. 2d, at 161-162.
(b) **Sections 1401 and 1409 date from an era when the Nation's lawbooks were rife with overbroad generalizations about the way men and women are. Today, such laws receive the heightened scrutiny that now attends** ``all gender-based classifications," *J. E. B. v. Alabama ex rel. T. B.*, 511 U. S. 127, 136, 114 S. Ct. 1419, 128 L. Ed. 2d 89, including laws granting or denying benefits ``on the basis of the sex of the qualifying parent," *Califano v. Westcott*, 443 U. S. 76, 84, 99 S. Ct. 2655, 61 L. Ed. 2d 382. Prescribing one rule for mothers, another for fathers, §1409 is of the same genre as the classifications declared {2017 U.S. LEXIS 4} unconstitutional in *Westcott*; *Reed v.*

There is overwhelming evidence that the DHS/ICE and the agencies which oversee immigration proceedings are participating in a process which is no more than thinly veiled and improperly disguised enforcement and adjudication of discrimination (DEAD) against persons from Africa, Mexico, Majority Muslim, Latin American, Caribbean, and Communist Controlled (AMMMLACCC) countries. Within this DEAD practice there is heightened discrimination against persons whose heritage is from Caribbean countries with significant black populations. Cheikh Diakhate falls in this category, being that his mother is a national of the Jamaica.

**Statutes Are UnConstitutional—Arbitrary and Discriminatory Enforcement**:

8 U.S.C. 1226 etc are unconstitutional for vagueness due to arbitrary and discriminatory enforcement. "**There is no discernible limit to prosecutorial discretion**, and, in fact, **prosecution seems to have been random at best over the decades**." Evidence of this is that U.S. citizens such as Mohammed Darwish, Davino Watson, Michael Robinson, Wayne D. Gray; Morales-Santana; Luis Alberto Tineo; Foncette; and Duarte-Ceri xxx have each been detained by the DHS/ICE for up to three and one half years; placed in removal proceedings with their A-Files withheld and/or facts in their A-Files misrepresented; or have been deported and charged with criminal re-entry into the United States is clear evidence of arbitrary

and discriminatory enforcement. This is so because all these persons are AMMMLACCC citizens. Further evidence of this type of discriminatory intent is the widescale discrimination against AMMMLACCC citizens reflected in **Nightingale v. USCIS** and/or **Orantes-Hernandez 2007**, xxx. While it is nopt clear who the victims are in Nightingale v. USCIS, the fact that there are consistent observations that 99 per cent of the persons detained by the DHS/ICE are AMMMLACCC citizens, the natrual and logical inference is that the non-citizens implicated in the **Nightingale v. USCIS** case are AMMMLACCC citizens. That is, "**virtually all [DHS/ICE] prosecutions seem to have been targeted at** ~~religiously motivated cohabitation~~ **[AMMMLACCC citizens]."** In case **Keyes, et al., v. Congress of Hispanic Educators, et al.**, 902 F. Supp. 1274; 1995 US Dist LEXIS 141431995 U.S. Dist. LEXIS 14143 the court states:

"But the more glaring problem with the Statute is its "arbitrary or discriminatory enforcement." *Id*. "The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, **reduces the danger of caprice and discrimination in the administration of the laws**, enables individuals to conform their conduct to the requirements of law, and **permits meaningful judicial review**." *Roberts v. United States Jaycees*, 468 U.S. 609, 629, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984) (emphasis added). Unlike in *Roberts*, the Statute implicates these concerns. {2013 U.S. Dist. LEXIS 161} **There is no discernible limit to prosecutorial discretion**, and, in fact, **prosecution seems to have been random at best over the decades**. And **virtually all prosecutions seem to have been targeted at religiously motivated cohabitation**, as noted above. Here, the State seems to have various policies about whether to prosecute polygamists. **Defendant himself has sent mixed signals about his intention to prosecute, currently claiming in an affidavit** (when it was expedient for his motion to dismiss based on mootness) **that he has established a policy that his office will not prosecute religiously motivated cohabitation** (or cohabitation at all) **absent the presence of some collateral crime**. (Second Buhman Aff ¶ 8 [Dkt. No. 47-1]; see also Def.'s Mem. Supp. Mot. Dismiss for Mootness at [4] [Dkt. No. 47].). But Defendant disclaims adherence to this policy by any successors in his office. *Id*.

These various policies create substantial uncertainty about whether one will be prosecuted under the Statute if engaging in religiously motivated cohabitation, or simple cohabitation with no religious motivation, or for one but not the other, **or even about whether the Statute is moribund as a result of widespread {2013 U.S. Dist. LEXIS 162} prosecutorial inaction**. The apparently limitless prosecutorial discretion in whether and {947 F. Supp. 2d 1226} whom to prosecute under the Statute "**vests virtually complete discretion in the hands of [law enforcement and prosecutors]** to determine whether" people cohabiting in the State of Utah for whatever reason, but particularly those involved in religiously motivated cohabitation, have violated the Statute's cohabitation prong. *Carhart*, 550 U.S. at 150 (quoting *Kolender*, 461 U.S. at 358 (invalidating a statute regulating loitering)). **The cohabitation prong is therefore void for vagueness and will be stricken**."

## 3 Years Of Misrepresentations Necessitating Prophylactic Measures Against Trini E. Ross and The United States Attorney's Office for the Western District of New York

There is growing evidence that, for the last three (3) years, lawyers representing the Buffalo Federal Detention Facility (BFDF) and/or the DHS/ICE have engaged in a pattern and practice of misrepresentations before the courts. In 2020, in *Hassoun v. Searls*, **453 F. Supp. 3d. 612, 2020 U.S. Dist. LEXIS 63522**, in Federal District Court (FDC) proceedings before Honorable Judge Elizabeth A. Wolford (E.A.W.), sworn declarations of BFDF employees were submitted by lawyers from the United States Attorney's Office (USAO) for the Western District of New York (WDNY). These BFDF employee declarations indicated that persons who had potentially contracted COVID-19 were housed on the same floor as other persons in the Special Housing Unit (SHU) at BFDF. In the declarations, claims

were made that those who had potentially contracted Covid-19 were 150 feet

away from Hassoun, who was at increased risk of death from Covid because he

had underlying co-morbidities.

Furthermore, the SHU facility at BFDF has no more than two cells with their own

showers. Between positive cases and potential Covid cases there were eight

persons. Between sworn declarations of Captain Abelardo Montalvo, M.D., and

Captain Carlos M. Quinones-Ortiz, M.D., there were explicit lies under penalty of

perjury. See Section II of ***Hassoun v. Searls*** discussing DKT. 140; DKT. 145; and

DKT. 148, the declaration of Quinones-Ortiz and Montalvo. Since there are only

two SHU cells with thier own shower, the following excerpt from ***Hassoun v.***

***Searls*** reveals the lies:

> "Petitioner is currently housed in medical isolation in the Special Housing Unit ("SHU") at the
> BFDF. (Dkt. 145 at ¶ 24). He is placed in a single-occupant cell with a solid metal door and glass
> window. (Id.). The SHU has beds for 32 detainees, but currently houses only 13. (Dkt. 140-2 at ¶
> 12). **Petitioner's cell has its own shower**, an individual toilet and sink, and soap and shampoo
> for cleaning. (Id. at ¶¶ 13-14).
>
> The BFDF has taken steps to prevent the spread of COVID-19 within the facility. Captain
> Abelardo Montalvo, M.D., who is employed by Immigration and Customs Enforcement ("ICE")
> {2020 U.S. Dist. LEXIS 9} as the Eastern Regional Clinical Director for the ICE Health Services
> Corps, and who provides oversight for the medical facilities at the BFDF, has submitted a sworn
> declaration in opposition to Petitioner's request for release. (Dkt. 145).
>
> As of April 8, 2020 (the date of Captain Montalvo's declaration), there were zero confirmed
> cases of COVID-19 among staff or detainees at the BFDF. (Id. at ¶ 29). Three detainees who had
> complained of symptoms that could be indicative of COVID-19 had been placed in isolation in
> the medical bay. (Id. at ¶ 30). **An additional five detainees who were in close contact with
> those three individuals had been placed in isolation in the SHU.** (Id. at ¶ 31). At that time,
> Captain Montalvo reported that the closest any of these individuals' cells was to Petitioner's cell
> was 150 feet. (Id. at ¶ 38)."
>
> ...

"On April 9, 2020, Respondent informed the Court that four cases of COVID-19 had been confirmed in the BFDF. (Dkt. 141; Dkt. 148). Captain Carlos M. Quinones, M.D., Clinical Director for ICE with oversight authority for the BFDF, has submitted a sworn declaration stating the following: (1) the four confirmed cases are among the eight individuals who had previously been isolated; (2) these four individuals are currently housed in isolation in the SHU and are at least 50 feet from Petitioner's cell; (3) **Petitioner does not share any space with these four individuals**; (4) Petitioner has been provided an assigned tablet; (5) the B-2 Unit, in which the four individuals were previously housed, has been isolated from the rest of the population and will remain so for 14 days;"

On April 10, 2020, Judge Wolford was then misled into making the statement:

"Petitioner's [Hassoun's] individual circumstances are particularly well-suited to avoiding infection. **He is housed in a single-occupant cell with his own** toilet, sink, and **shower,** as well as his own supply of soap and shampoo. "

Judge Wolford had been misled because almost two weeks earlier, on March 25,

2020, in **Jones v. Wolf**, 467 F. Supp. 3d 74 (W.D.N.Y. 2020), Judge Vilardo wrote:

"The petitioners are twenty-two civil immigration detainees, currently held in the custody of ICE at the BFDF. Docket Item 1. Each petitioner is "either over the age of fifty and/or [has] a serious underlying medical condition, making [him] more vulnerable to complications arising from COVID-19," ... "

...

"So it remains plausible that the respondents could rectify the ongoing violation by providing those petitioners who meet the CDC's definition of vulnerable individuals with a living situation that facilitates "social distancing." The respondents might, for example, house those individuals in individual cells or units with a limited number of individuals akin to a family unit outside the facility; eat their meals, **bathe, and shower in isolation** or only among those in their smaller unit"

In **Ramsundar v. Wolf**, 2020 U.S. Dist. LEXIS 62768, 2020 WL 1809677, at *4-6 (W.D.N.Y. Apr. 9, 2020), Judge Vilardo wrote:

"As of today [April 9, 2020], Captain Montalvo has identified 13 of the 22 remaining Jones petitioners and 3 of the 4 Ramsundar petitioners as meeting these criteria."

...

"Respondent Jeffrey Searls, Officer in Charge of BFDF, has attested that of the 13 vulnerable Jones petitioners, 9 individuals—Blackman, Commissiong, Harsit, Lainez Mejia, Brathwaite, Espinal-Polanco, Forbes, Quintanilla-Mejia, and Sow—have been provided with their own cells; 2 individuals—Adelakun and Nwanwkohave been released; and 2 individuals—Concepcion and Falodun-remain in a communal-living situation under quarantine. Jones, Docket Item 47 at 2-3, Docket Item 59 at 3. He also has attested that of the 3 vulnerable Ramsundar petitioners, 1 individual—Shane Ramsundar—has been provided his own cell; 1 individual—Cedeno-Larios—has been released; and 1

individual—Gomatee Ramsundar—remains in a communal-living situation because BFDF does not have any individual cells for female detainees. Ramsundar, Docket Item 6-3 at 23-4, Docket Item 10 at 5-7."

On April 9, 2020, Vilardo himself was misled, as evinced by Vilardo's statement in *Jules v. Mayorkas*, 2023 U.S. Dist. LEXIS 40800, where Judge Vilardo wrote:

> "On April 9, 2020, this Court found that the respondents' proposed social distancing measures largely were sufficient to remedy the previously identified constitutional violation. See *Ramsundar v. Wolf*, 2020 U.S. Dist. LEXIS 62768, 2020 WL 1809677, at *4-6 (W.D.N.Y. Apr. 9, 2020)."

Judge Vilardo was also misled in *Ramsundar v. Wolf* where he stated:

> "The Court also is satisfied that the respondents' actions with respect to Jones petitioners Blackman, Commissiong, Harsit, Lainez Mejia, Brathwaite, Espinal-Polanco, Forbes, Quintanilla-Mejia, and Sow, and Ramsundar petitioner Shane Samsundar, have remedied the previously-identified Due Process violation. More specifically, the following measures have adequately facilitated these petitioners' taking the "social distancing" measures promulgated by the CDC and the New York State Department of Health: placement in single-occupancy cells;2 accommodation to eat meals in those cells **and to bathe and shower in isolation**; ..."

Bathing and showering in isolation at the BFDF for as many persons as were

vulnerable, and/or had been infected or potentially infected, was simply

**IMPOSSIBLE**. The fact that there are only two cells with their own showers in the

BFDF SHU; and that were at least 5 potential cases of Covid 19 in the SHU at BFDF,

and 16 vulnerable petitioners according to Montalvo's criteria in *Ramsundar v.*

*Wolf* mean that the misrepresentations are now apparent, and Judge Vilardo's

injunction had been breached but the misrpresentations were used to disguise

that breach. That is, in front of Judge Wolford, the declarations made claims that

Hassoun could shower in isolation. This was clearly to suggest that Judge Vilardo's

injunction was being adhered to.

However, the sheer number of persons in Hassoun's situation, together with eight potential cases (3 claimed to be housed in the medical unit and 5 in the SHU), mean that the BFDF could not have been adhering to Judge Vilardo's injunction for all at least sixteen (16) vulnerable individuals and the eight individuals who were potentially exposed to COVID-19. The misrepresentations were not only material, they were potentially deadly. This is so because the misrepresentations were made to shield the fact that Hassoun, a person with underlying co-morbidities, shared a shower with persons who had potentially contracted COVID-19, and was usually in reasonably close proximity to them.

If Hassoun had been in a cell with his own shower, it stands to reason that only one of the persons who had potentially or actually contracted Covid was in a cell with a shower of his own. The other four were in cells without showers and were therefore sharing showers with any other persons housed in SHU, or any other housing unit in which those persons were housed. Carlos Quinones-Ortiz's declaration in **Hassoun** shows that the perjured statements were modified to suggest a distance of 50 feet instead of the original 150 feet. This is of no consequence. This is so because footnote (fn) 1 of **United States of America v. Nagriel**, 2022 US Dist LEXIS 2297372022 U.S. Dist. LEXIS 229737, shows that, Quinones-Ortiz himself frequently participates in what is a pattern and practice,

where extreme lies are withdrawn and replaced with more moderate lies. It is unconscionable to think that medical professionals and government lawyers, at a time when Covid transmission was believed to be possible via the touching of surfaces, and when it was known that persons with pre-existing co-morbidities were at greater risk of death, could perjure themselves before the FDC's in pursuit of exposing a person with co-morbidities to an increased risk of contracting COVID-19.

The egregious nature of the misconduct by the medical professionals is revealed by the fact that their perjured declarations was in stark contrast to the most fundamental principle of medicine, the Hippocratic Oath, which in essence says "do no harm". Equally egregious is the fact that government lawyers had suborned their perjury and submitted it to the Court. The deep responsibility that government lawyers have to society, justice, and the preservation of public confidence in the system of justice is underscored by EAW's statement in Negriel as follows:

> "It is well established that government attorneys have a "heightened ethical obligation... to endeavor to do justice" *DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600 (E.D.N. Y. 2017) (internal quotation marks omitted); see also *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935) ("**The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore . . . is not that it shall win a case, but that justice shall be done.**"). As another judge in this Circuit has observed, "[g]overnment lawyers wield enormous . . . power. They must exercise it in a way that is fully consistent with their constitutional and ethical obligations. And it is the obligation of the courts to ensure that they do and hold them accountable if they do not." *United States v. Nejad*, 487 F. Supp. 3d 206, 208

(S.D.N.Y. 2020). Here, **the government submitted false statements to the Court in support of a request that it be permitted to invade Defendant's bodily autonomy,** without any input from him or his lawyer, thus falling short of living up to these ideals. The Court identifies below what it views as the major failures in this case and the causes thereof."

...

"**The Court turns first to the submission of sworn declarations containing false information.** ... **There can be no question that the inquiry performed in this case was not adequate, and that there was an insufficient basis for the factual representations made** to the Court".

...

"However, as noted above, **attorneys for the United States of America have been entrusted by the public with enormous power. In return, the public-and the Court-expect that power to be wielded with the utmost care,** even under urgent circumstances".

"**It goes without saying that it significantly frustrates the Court's ability to do justice when it cannot rely on the veracity of information supplied to it by government attorneys, who, as explained above, have a heightened ethical duty.** It also undermines the public's confidence in the justice system. See *Nejad*, 487 F. Supp. 3d at 225 ("**With each misstep [by the government], the public faith in the . . . justice system further erodes.**"). In this case, **the gravity of the government's errors was compounded by the fact that relief was sought on an emergent basis,** on a date when the Court was not open to the public, and on an ex parte basis".

Taken together, the *Negriel* decision, *Jones* decision, *Ramsundar* decision, and the *Hassoun* decision, over a 3 year span, reveal a pattern and practice of perjury and/or misrepresentations of  BFDF employees and/or attorneys from the USAO, which were submitted to the Courts. The Courts were deceived by the misrepresentations and/or perjured declarations, and/or upon learning of these infirmities gave the lawyers involved the benefit of the doubt; while the declarations of others were viewed with skepticism. For example, Dr. Meyer and Dr. Greifinger provided decalarations in support of Haasoun, which were viewed with skepticism. See the *Negriel* decision and the *Hassoun* decision, which between them contain the xcerpts:

**Hassoun Decision:**

"The expert declarations submitted by Petitioner do not change the Court's conclusion. **The declaration of Dr. Robert Greifinger, while providing information regarding the general risk of COVID-19 in correctional and detention facilities, does not relate to Petitioner or the particular conditions at the BFDF**, addressing instead an ICE detention facility in Tacoma, Washington. (Dkt. 122-3). Indeed, in some ways Dr. Greifinger's declaration militates against Petitioner's request, as Dr. Greifinger states that "[s]ocial distancing and hand hygiene," both of which are being employed at the BFDF, are "the only known ways to prevent the rapid spread of COVID-19.""

"By contrast, the supplemental declaration {2020 U.S. Dist. LEXIS 28} of Dr. Jaimie Meyer (Dkt. 129) does specifically address Petitioner and the conditions at the BFDF. Dr. Meyer opines that the BFDF is "not able to adequately protect [Petitioner] from COVID-19 infection and he remains at imminent risk of harm." (Id. at ¶ 18). However, **Dr. Meyer's opinion is based on incomplete or inaccurate information regarding the conditions at the BFDF.** For example, **Dr. Meyer states that there is no information regarding whether healthcare workers entering the BFDF are being screened or whether Petitioner has adequate access to soap for hand washing. (Id. at ¶¶ 11, 13). However, those questions are answered (in the affirmative) by Respondent's most recent submissions.** Further, Dr. Meyer assumed that Petitioner did not have access to disinfectant to clean common use surfaces, and expressly relied on that assumption when concluding that Petitioner was inadequately protected. (Id. at ¶¶ 10, 18). As discussed above, this assumption was incorrect, as Respondent's opposition make it clear that Petitioner has continual access to cleaning supplies and disinfectant sprays. **Dr. Meyer also did not have knowledge about the PPE protocols now in place the BFDF. For these reasons, the Court does not find Dr. Meyer's supplemental declaration persuasive.**"

"The Court does not take lightly the threat caused to Petitioner by COVID-19. As Judge Vilardo observed in *Jones*, "this Court is not aware of any other disease that caused New York State-let alone most of the nation-to decide that the only reasonable course of action was to shutter the economy, shelter in place, and isolate at home for weeks on end." 2020 U.S. Dist. LEXIS 58368, 2020 WL 1643857, at *12. The Court further recognizes that Petitioner's personal health circumstances put him at increased risk of serious illness. However, **the record before the Court demonstrates that Respondent has taken substantial, reasonable steps to prevent the spread of COVID-19 to Petitioner**. While the risk to Petitioner has not been, and indeed could not be, eliminated entirely, Petitioner has not demonstrated deliberate indifference thereto. **On these facts, the Court cannot order Respondent to release Petitioner to home incarceration.**"

...

**Negriel Decision:**

"As to the failure to advise Defendant's immigration counsel prior to or upon filing the TRO application, Federal Rule of Civil Procedure 65 carefully circumscribes the circumstances under which a TRO may be issued "without written or oral notice to the adverse party or its attorney," including that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition[.]" Fed. R. Civ. P. 65(b)(1)(A). Here, in light of the after-disclosed fact that Defendant had consistently been eating solid food and drinking nutritional supplements in the days leading up to the filing of the ex parte TRO application, it is apparent that standard was not satisfied.{2022 U.S. Dist. LEXIS 9} There is accordingly no justification for the failure to provide notice to Defendant's counsel, and information regarding counsel's identity should have been immediately provided to the AUSA and the Court".

...

"To be clear, the Court does not find that any attorney engaged in intentional misconduct, nor is it issuing sanctions under Rule 11. Instead, the Court will take what it views as necessary prophylactic measures to ensure that this situation does not arise again."

...

"it is further ORDERED that Trini Ross, United States Attorney for the {2022 U.S. Dist. LEXIS 11} Western District of New York, shall ensure that all AUSAs under her supervision read this Decision and Order, and that within two weeks of the date of this Decision and Order, Ms. Ross shall file a declaration affirming that this has occurred."

The last quoted paragraphs reveal that the credibility of others were called into question, while the perjured declarations of BFDF employees and/or misrepresentations by lawyers serving the DHS/ICE, BFDF, or out of the AUSO for the WDNY were given the benefit of the doubt. There is evidence that this should not have been the case. This evidence comes from:

(a) *Quituizaca v. Barr*, 2021 U.S. Dist. LEXIS 254681.

(b) *Forbes v. Garland*, 2021 U.S. Dist. LEXIS 78676.

(c) *Mathon v. Searls*, 2022 U.S. Dist. LEXIS 155606. See pages 11-12 where it shows that Michael Ball was only a D.O., but it appears he was rewarded for his lies submitted in Dayvid De Olivera Jimenez's and Agard's cases, which might have also been the declaration in Tucker and Forbes cases.

(d) *Tucker v. Searls*, 2022 U.S. Dist. 204296, at footnote 3, where the Honorable Lawrence Vilardo, politely and diplomatically highlighted that BFDF employees, with the aid of Trini Ross, Adam A. Khalil, and/or lawyers of the

USAO for the WDNY, submitted perjured testimony to the FDC for the WDNY.

(e) In **Moco v. Searls** {**WDNY Case: 23-vc-6316-FPG**}, during July 2023, Trini Ross and/or Adam A. Khalil solicited perjured testimony from Peter Sukmanowski and Sean McDonald, in support of their opposition to Robert Moco's Habeas petition. The same perjured delaration of Peter Sukmanowski has again been submitted in the habeas petition of Sosa-Bustilloxxx.

The significance of the cases listed above is that there is a pattern and practice of perjury or misrepresentation that spans at least three (3) years. Importantly, Trini Ross and/or Adam A. Khalil  and/or other lawyers out of the USAO for the WDNY for the entire three year period had been soliciting or receiving perjured declarations from the same individuals, among them was Michael K. Ball and Carlos Quinones-Ortiz. It appears either or both Ball and Quinones-Ortiz were rewarded for their perjured testimony. With repetition for emphasis, in August 2022, the **Mathon** case reveals that Michael K. Ball was simply a Deportation Officer (D.O.). See pages 11-12 sub-section II(c) of **Mathon**. As he did in **Mathon's** case, Ball would submit stale dated declarations, in the cases of Alvin Agard and Dayvid Jimenez. Notably, the declarations submitted in Agard's and Jimenez's cases contained similar lies to those submitted in the Sukmanowski declaration in Moco's case. Evidence of Ball's promotion is that the

first paragraph of the December 2022 Decision and Order (D&O) in **Negriel's** case,

reveals that Ball had been promoted to "Assistant Field Director with the U.S.

Department of Homeland Security".   The third paragraph of the **Negriel** D&O

goes on to show that both Michael K. Ball and Carlos Quinones-Ortiz had perjured

themselves in a process which deceived a federal court into issuing a TRO. These

perjured declarations were submitted to said court by lawyers supervised by Trini

E. Ross. Indeed, Adam A. Khalil, who appears as lead attorney for the

government/Searls in the habeas petitions of Agard, Jimenez, Moco, and Thomas,

is listed as the government's lead attorney in the **Negriel** case. Khalil is also listed

as the lead attorney for the government/Searls in the **Tucker** case and the **Curry v.**

**Forbes** case.

　　These perjured testimonies, with the support of the USAO, begs the

question of how widespread the misconduct running through the BFDF, the

DHS/ICE, and the USAO for the WDNY goes. At least as a prophylactic measure to

ensure that the habeas and/or IC trials involving persons detained at BFDF are

fair, the courts should order that an independent investigator and an independent

prosecutor be assigned to identify and prosecute any criminal conduct connected

to the activities described herein. As a part of those prophylactic measures, the

court should suspend the participation of Trini E. Ross and/or any other lawyers

under her supervision in any habeas petitions connected to the BFDF, which are

currently pending or will commence in the reasonable foreseeable future. The is

an overarching and alarming pattern of lies by the DHS/ICE and the BFDF; and

their employees and lawyers.

Further evidence of the alarming misrepresentations by the DHS/ICE and/or

the BFDF is that footnote 11 and the surrounding text of ***Aparico Jimenez v.***

***Decker***, 2021 U.S. Dist. LEXIS 40727) states:

> "See Nicole Einbinder et al., **After an Insider Investigation, ICE Reverses its Claim that it Asked States to Vaccinate Detained Immigrants, Business Insider** (Feb. 23, 2021, 8:35 a.m.), https://www.businessinsider.com/ice-walks-back-covid-vaccine-claim-deflects-responsibility-2021-2. **None of the health departments in the forty states where ICE detention facilities are located have confirmed that ICE has contacted them about vaccination plans for detainees**. *Id*. In fact, **the New York health department redirected reporters' questions regarding vaccinating immigrant detainees to ICE, suggesting that it was not taking responsibility for vaccinating immigrants**. *Id*.; see also Jones v. Wolf, No. 20-cv-361-LJV (W.D.N.Y. 2021), Doc. 162 (minute entry by Judge Lawrence Vilardo ordering the Government to submit a plan for making the vaccine available to eligible ICE detainees at the Buffalo Federal Detention Facility); ICE Ordered to Create Vaccine Plan for Detainees at NY Facility, NBC New York (Feb. 27, 2021, 2:01 p.m.), https://www.nbcnewyork.com/news/local/ice-ordered-to-create-vaccine-plan-for-detainees-at-ny-facility/2914137 (describing Judge Vilardo's order as "the first of its kind in the country").

At footnote 3 of ***Quituizaca***, Judge Vilardo politely and diplomatically rules

that he had been lied to. Indeed, Judge Vilardo is so kind he describes his own

findings, based on the USAO's lies, as "inaccurate" and refrains from directly

saying the USAO engaged in misrepresentations or lies. True to diplomatic form,

at the third to last paragraph of sub-section B(1), page 6, of the ***Curry W. Forbes***

decision Judge Vilardo highlights that Adam K. Khalil is engaging in

"misrepresentation" without using the word. Judge Vilardo States:

> "Here, **the respondents [ICE/Searls] argue that "the majority of [the time Forbes has been in detention] is due to [his] own actions and choices**." Docket Item 7 at 13, 14 (arguing that Forbes "is solely responsible for delays amounting to over 9 months"), (**arguing that Forbes is responsible for "delays amount[ing] to nearly 11 months"**). And it is true that Forbes may have prolonged his detention by causing some of the delay in his removal. But **any delay that Forbes may have caused totals far less than 11 months**".
> "...".
> "**The Court does not agree with the respondents that "[all of] the delays were avoidable and fully due to [Forbes]'s actions.**" Docket Item 7 at 14. In fact, **a significant amount of the delay was the direct result of circumstances outside of Forbes's control**, such as the repeated failures by his first immigration attorney to file papers and appear for hearings as well as the COVID-19 pandemic. Although Forbes may have caused some of the delay, he has not "abus[ed] the processes provided to him." See *Hechavarria*, 891 F.3d at 56 n.6 (quoting *Nken*, 556 U.S. at 436). And even excluding a delay of 11 months-the longest amount of time the respondents allege-Forbes's total detention still would be more than a year. Therefore, the third factor also weighs in Forbes's favor".

Footnote 11 of ***Aparico Jimenez*** suggests that the 2020 decision in

*Jones* 2020, ***Kevin Ruddock*** 2020, and/or ***Hassoun*** 2020, may have been a

result of BFDF/USAO WDNY misrepresentations. The lies in the last quotes

are similar to lies in the Moco case with respect to (wrt) the declarations of

Sean McDonald and/or Peter sukmanowski. In the end a pattern and

practice of perjury and perfidity is patent and pronounced.

## IV. REMEDY

For the reasons stated above, Cheikh Diakhate has met the criteria for a

preliminary injunction and/or a TRO. The next question is what remedy is

appropriate under the circumstances. Cheikh Diakhate seeks their immediate

release under conditions of supervision and, ultimately, a writ of habeas corpus

under 28 U.S.C. § 2241. Cheikh Diakhate also seeks remedy pursuant to a Bivens

action; 42 U.S.C. §§ 1985-1986; and/or 28 U.S.C. §§ 2671 et. seq., especially 2679

(b)(2). The damages Cheikh Diakhate seeks should be awarded in accordance with

Section V of *Watson v. The United States Of America*, 2016 U.S. Dist. LEXIS

23250. Cheikh Diakhate's Bivens Action, and other claims which appear separate

from a habeas corpus petition being filed together with a habeas corpus petition

has legal support, as found in the following excerpt from *Park v. Thompson*, 356

F. Supp. 783; 1973 U.S. Dist. LEXIS 14353:

> "Even pre-Braden, this court would have jurisdiction of plaintiff's habeas corpus
> petition. **Such jurisdiction has** {356 F. Supp. 787} **been held to continue where the
> petitioner's absence was occasioned by a post-filing involuntary removal**. *Jones v.
> Cunningham*, 371 U.S. 236, 83 S. Ct. 373, 9 L. Ed. 2d 285 (1963); *Ex parte Endo*, 323 U.S.
> 283, 65 S. Ct. 208, 89 L. Ed. 243 (1944); *Smith v. Campbell*, 450 F.2d 829 (9th Cir. 1971);
> *Bishop v. Medical Superintendent of Ionia State Hospital*, {1973 U.S. Dist. LEXIS 11}
> 377 F.2d 467 (6th Cir. 1967); *Harris v. Ciccone*, 417 F.2d 479 (8th Cir. 1969), cert.
> denied, 397 U.S. 1078, 90 S. Ct. 1528, 25 L. Ed. 2d 813 (1970). While it is true that the
> cited cases all involved actions that had commenced as habeas corpus proceedings,
> here the omission from the original complaint of 28 U.S.C. § 2241 as an additional
> jurisdictional ground and of a prayer for a writ of habeas corpus as an additional
> remedy should not be treated as a matter of any great significance. **The alleged facts
> are the same, the claimed rights are the same, the demanded corrective action is the
> same, the areas of discovery are the same. Defendants are in no way prejudiced by
> the assertion of another avenue for relief.**
>
> The reverse situation was ruled on in *Wilwording v. Swenson*, 404 U.S. 249, 92 S. Ct.
> 407, 30 L. Ed. 2d 418 (1971), where **the Supreme Court read habeas corpus petitions as
> also requesting relief under § 1983**. See also *Rodriguez v. McGinnis*, 456 F.2d 79 (**2d
> Cir.** 1972), and *United States ex rel. Stuart v. Yeager*, 293 F. Supp. 1079 (D.C.N.J. 1968),
> to the same effect, and *McClain v. Manson*, 343 F. Supp. 382 (D.C. Conn. 1972), in
> which the court found habeas aspects in Civil {1973 U.S. Dist. LEXIS 12} Rights Act cases
> for purposes of allowing attorney's fees. And cf. *Jones*, supra, in which the petitioner
> was permitted to amend his pending federal habeas corpus petition to change the
> custodial defendants from the superintendent of the state penitentiary to the members

## CLAIMS FOR RELIEF

### COUNT ONE:

PETITIONER'S PROLONGED DETENTION VIOLATES THE UNITED

STATES CONSTITUTION.

Petitioner's detention by Respondent is based on a criminal conviction for which

petitioner has already served the prison time. Based on the racial mix of detainees

in DHS/ICE detention similary situated WECANZS citizens have been released.

That is, WECANZS citizens similarly situated to petitioner have not been taken

into DHS/ICE custody. This arrest and detention was in contravention of the 5th

Amendment of the U.S. Constitution becuase it based on arbitrary and

discriminatory enforcement of immigration law.

of the state parole board after he had been paroled and removed to another state.

Finally, **the only effect of a refusal to allow plaintiff to restyle her pending complaint as a petition for a writ of habeas corpus would be to put her to the trouble and expense of refiling. No principle of justice or administration requires such a result**."


In *JONES, et al. v. WOLF, et al*, the Court states:

"Section 2241(c)(3) provides: "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." Courts are divided on whether section 2241 provides a vehicle for challenging (and a remedy for addressing) allegedly unconstitutional conditions of confinement.11

{467 F. Supp. 3d 95} This Court need not resolve these difficult questions at this junction because **the Second Circuit "has long interpreted [section] 2241 as applying to challenges to. . . prison conditions**," *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (citation omitted)-at least to the extent the petitioners seek a remedy short of release-and this Court is not convinced that the unconstitutional conditions at BFDF cannot be remedied through an injunction."

of the state parole board after he had been paroled and removed to another state.

Finally, **the only effect of a refusal to allow plaintiff to restyle her pending complaint as a petition for a writ of habeas corpus would be to put her to the trouble and expense of refiling. No principle of justice or administration requires such a result**."

In ***JONES, et al. v. WOLF, et al***, the Court states:

"Section 2241(c)(3) provides: "[t]he writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." Courts are divided on whether section 2241 provides a vehicle for challenging (and a remedy for addressing) allegedly unconstitutional conditions of confinement.11

{467 F. Supp. 3d 95} This Court need not resolve these difficult questions at this junction because **the Second Circuit "has long interpreted [section] 2241 as applying to challenges to. . . prison conditions,"** *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (citation omitted)-at least to the extent the petitioners seek a remedy short of release-and this Court is not convinced that the unconstitutional conditions at BFDF cannot be remedied through an injunction."

CLAIMS FOR RELIEF

COUNT ONE:

PETITIONER'S PROLONGED DETENTION VIOLATES THE UNITED

STATES CONSTITUTION.

Petitioner's detention by Respondent is based on a criminal conviction for which

petitioner has already served the prison time. Based on the racial mix of detainees

in DHS/ICE detention similary situated WECANZS citizens have been released.

That is, WECANZS citizens similarly situated to petitioner have not been taken

into DHS/ICE custody. This arrest and detention was in contravention of the 5th

Amendment of the U.S. Constitution becuase it based on arbitrary and

discriminatory enforcement of immigration law.

The 5th Amendment is quite clear as it states that no person shall be subject for the same OFFENCE to be twice put in jeopardy, nor can the laws be enforced in a manner that discriminates on the basis of race or nationality. Since arbitrary and discriminatory enforcement of immigration laws violate the Equal Protection Clause, Respondent did not and does not have the authority to have Petitioner in detention.

## COUNT TWO

Respondent initiated removal proceedings against Petitioner, charging that he, as a n AMMMLACCC country citizen is removable based on his race or nationality but under the pretext that he had overstayed a visa or had been convicted of a deportable crime. Petitioner reiterates that similarly situated WECANZS country citizens are not proportionately in DHS/ICE detention at the BFDF. This discrimination based on race and/or nationality is in contravention of the U.S. Constitution. The DHS/ICE's action suggests that they have a Constitutional right to remove Petitioner from the United States of America based on arbitrary and discrimatory enforcement of immigration law. This is not so. Regulations are entitled to consideration in interpretation of treaty, but IMMIGRATION REGULATIONS CONFLICTING WITH TREATY ARE INVALID. Petitioner herein informs this court that his arrest, detention, process for deportation and any

Final Order for deportation by Respondent is incorrectly based on arbitrary and discrimiantory enforcement of immigration law. 8 CFR § 287,and all its subsections, are Immigration Regulations which conflict with treaty and/or the constitution based on its arbitrary and discriminatory enforcement. See ***Hines v. Davidowitz*** (1941) 312 US 52, 85 L Ed 581, 61 S Ct. 399. Also see ***Shizuko Kumanomido v Nagle*** (1930, CA9 Call) 40 F. 2d. 42.

COUNT THREE

The actions of Respondent, to arrest, detain and process almost entirely only AMMMLACCC country citizens for deportation, evidently, beleiving the U.S. Constitution gave the power to do so, is in fact totally incorrect. The power to apply for Constitutional Amendment is vested within State Legislatures and Framers of the Constitution did not intend that people, through initiative process, could affect deliberative process. That is, the U.S. Constitutuion has not been amended to allow for arbitrary and discriminatory enforcement of laws based on discriminatory animus targeting people of specific races or nationalities. See ***State ex. rel. Harper v. Waltermire***, 691 P 2d. 826 (Mont. 1984). This makes the action unconstitutional so Petitioner is asking this court, to order that petitioner be released, or be granted a bond hearing within fourteen days. This bond hearing should conform with Due Process, and this Court shiold set parameters to guide the bond court as to what constitutes arbitrary and discriminatory enforcement of

fourths of the several States, or by Conventions in three fourths thereof, as the one

or the other Mode of Ratification may be proposed by Congress; Provided that no

Amendment which may be made prior to the Year One thousand eight hundred

and eight shall in any Manner affect the first and fourth Clauses in the Ninth

Section of this Article; and that no State, without its Consent, shall be deprived of

its equal Suffrage in the Senate as stated by Article V of the U.S. Constitution.

Clearly, there is no such Constitutional Amendment giving Respondent or any

other government agency, person or persons, the power to redefine who is

removable from the United States of America, especially on the basis of arbitrary

and discriminatory enforcement. Not even the U.S. Attorney General, President of

the United States of America, or any government agency, has the power to amend

the U.S. Constitution. Only an ACT of Congress stating they have amended the

U.S. Constitution can achieve the result, but the result is still constituionally void

if there is arbitrary and discriminatory enforcement. Provided, the enacting

Congress members who amended the INA after 1952 removed the racial and

nationality based discriminatory animus from those laws, there is no ACT of

Congress, which gives authority to Respondent to engage in arbitrary and

discriminatory enforcement of laws. As such, the discriminatory and arbitrary

commencement of removal proceedings against Petitioner and petitioner's

continued detention by Respondent is unconstitutional. Thus, this Court should

immigration laws.

Preamble of the Constitution has never been regarded as source of any substantive power conferred on government of United States, or on any of its departments, therefore Respondent has and never had the power to redefine who is removable from the United States of America in this case, citizens of AMMMLACCC countries. As continued detention of Petitioner by Respondent is unconstitutional, this court should waive the days for a response from Respondent and Order the immediate release of Petitioner as there is no likelihood of Respondent providing evidence or stating a constituionally valid law that allows for the arrest and continued detention of Petitioner, basede on his status as a citizen of an AMMMLACCC country.

## COUNT FOUR

Respondent, arresting, detaining and processing Petitioner for deportation is their way of concluding that they have the authority to do so. However, Petitioner is noting herein that they do not and cannot amend the U.S. Constitution as it can only be amended by Congress, whenever two thirds of both houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a convention for proposing Amendments, which, in either case, shall be valid to all intents and purposes, as part of the Constitution, when ratified by the Legislatures of three

authority under 8 U.S.C. §§ 1226 and/or 1231(a) for over 6 months must be released from custody if there is no significant likelihood that they will be removed in the reasonably foreseeable future; and/or if said detention is based on racial or nationality based animus amounting to arbitrary and discriminatory enforcement of immigration laws.

31. Continuing to detain Petitioner under 8 U.S.C. 1126 (c) and/or 1231(a)(6) while there is no significant likelihood of my removal in the reasonably foreseeable future, or where those statutes are unconstiututional because they are enforced in an arbitrary and discriminatory manner, deprives me of my "strong interest in liberty", and therefore violates the Fifth Amendment of the United States Constitution, *See U.S. v. Salerno*, 481 U.S. 739, 750 (1987).

32. I have no other adequate remedy at law other than the instant petition for a writ of habeas corpus.

waive the days for a response from Respondent and Order the immediate release

of Petitioner as there is no likelihood of Respondent providing evidence or stating

a law that allows for the arbitrary and discriminatory arrest and continued

detention of Petitioner.

## COUNT FIVE

The U.S. Constitution and the Laws of the United States which shall be made in

Pursuance thereof; and all Treaties made, or which shall be made, under the

Authority of the United States, shall be the **SUPREME LAW OF THE LAND**;

and the **JUDGES IN EVERY STATE SHALL BE BOUND THEREBY**, any

thing in the Constitution or Laws of any State to the Contrary notwithstanding. As

the continued arbitrary and discriminatory detention of Petitioner by Respondent

is unconstitutional, this court should waive the days for a response from

Respondent and Order the immediate release of Petitioner as there is no likelihood

of Respondent providing evidence or stating a law that allows for the arbitrary and

discriminatory arrest and continued detention of Petitioner.

## COUNT SIX

Framers of the U.S. Constitution employed words in their natural sense.

29.    I re allege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

30.    Non-citizens who have been detained by DHS pursuant to its statutory

## PRAYER FOR RELIEF

WHEREFORE, I pray that this Court grants the following relief:

1.  Assume jurisdiction of this matter; and grant all the relief set out at pages 2-5 of this document, and that are consistent with counts 1-6 listed across the last 5-10 pages, pages 54-61xxx, of this document. Furthermore, the court should implement prophylactic measures to insure that the kinds of misrepresentations described at pages 40-53xxx herein are never again repeated, not in this case or otherwise. As a part of those prophylactic measures, the Court should order that an independent investigator and an independent prosecutor be assigned to investigate and possibly prosecute violations of 18 U.S.C. §§ 401, 402, 1503, 1505, 1509, and/or 1621-1623.

2.  Use its authority under 28 U.S.C. §§ 2241, and/or 2243 to:

    (i)   Order Respondent to immediately release Petitioner as his arrest, detention and/or any final order of removal is due to arbitrary and discriminatory enforcement of immigration laws.

    (ii)  Order the Respondent to file an Answer and Return within 3 days of the filing of the petition, unless they can show good cause as to why the 99 per cent of detainees beign AMMMLACCC citizens does not amnount to arbitrary and discrimnatory enforcement of immigration laws.

(iii)    Order Petitioner's Reply be filed 15 days after the Court sets the

deadline for Respondent's Answer and Return;

(iv)    Order the Respondent not to transfer Petitioner outside the Western

District of New York during the pendency of this petition;

3.    Issue a writ of habeas corpus ordering the Respondent to immediately

release Petitioner  as his continued detention is Unconstitutional and a further

Order that in the event that the Respondent intends to file an Appeal, that this

court Order the Respondent to immediately release the Petitioner pending said

Appeal; and

4.    Grant any further relief that this court deems just and proper.


I affirm, under penalty of perjury, that I am the Petitioner, I have read this petition

and the information in this petition is true and correct.

Respectfully submitted,

Cheikh . Louis Diabbabe

Buffalo Federal Detention

Facility

4250 Federal Drive

Batavia, NY 14020                    11/27/2023

NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01EV6413...
Qualified in Genesee County
Commission Expires February 1, 202...

First name : Cheikh
Middle Name: Louis
Last Name: Diakhate
Alien Number:220-969-612
Buffalo federal Detention Facility
4250 Federal Drive Batavia New York 14020

Letter"s To The News Papers

Hello i have been unlawful Detained at the Buffalo Federal Detention Facility after Finished doing time
IN upstate Prison , DOc Handed me from wendy state prison on friday june 24th 2022 to Ice . I"m still
detained here at the buffalo federal Detention Facility my conserne is my safety ,my rigths were
vialoted by this immigration division , the Department of homeland security and Ice took away my
freedom and my rights from duration of detainment at this Facility . I Have Been Railroaded from the
department correctional of new york. (Doc)

Ice immigration Customs enforcement in Buffalo sended me to the shu after an fight with another
inmate over some tablet issues from the unit house on friday october 20 th 2023 . I was luck in 20 hrs a
day in the small cell of 3 walls and half small metal bed with an medium size window to an 1 hr break
per day.on that monday october 23rd 2023 i saw and watched in my own eye;s at 11 pm from the
inside of my cell by the left side of the other cell an Detainess in bleu uniform of cell 212 an non
speaking english young men got handcuffs pull out from his celll by 4 Ags Officers in green and khakis
pants 2 went inside the cell and collect some fruit that young men was saving orange.apples and small
countainers of orange juice.

Their Put in plastic bags while the 2 other officers pushing him on the wall with handcuffs in the
presence of two Lieutenant Mallone and Lieutenant Hare white shirts scuize him on the wall hold his
neck till his feet tip toe from the ground spread his legs cover his mouth told him to shut the fuck up
the young men couldn't move or eather breath at all , he told them that he just wanted to get his
proper medication cause the medication that their provided to him was not the rite one and its stared
to having some affect on him.

In here at the Buffalo Federal Detention Facility the fights are getting serious , the gangs are getting
deep and deeper by multiplie from everyday we not always threaten like human being, no program no
Religions services no class of emprovement nothing its worst then the upstate prisons and this is
suppose to be Detention Facility not prison.

I have been worst prison bud nothing like here we are threaten as crimes after serving our times pay
our depths from the crime that we serve the time for . I'm just sending this message out there so that
the world could know about the truth that goes behind this Buffalo Federal detention Facility we are so
tied . The non gorvement organization need to come to our rescue please thank you
from sharing this words with you looking foward to hear from you

your sincerly

cheikh Louis diakhate
11/7/2023

11/09/2023

KAYCEE LEIGH EVANS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01EV6413806
Qualified in Genesee County
Commission Expires February 01, 2025

CHEIKH DIAKHATE
220969612
BUFFALO SPC

We are writing to inform you of an unintentional information disclosure that occurred on November 28, 2022. On that date, a document was mistakenly posted on Immigration and Customs Enforcement's (ICE) public-facing website, ICE.gov, that included limited information on some individuals in ICE custody. Specifically, the document contained names, A-numbers, dates of birth, countries of citizenship, detention facility names, and other immigration information, including credible or reasonable fear decisions associated with each case. Unfortunately, ICE's review has determined that your information was included in the document.

After learning of this incident on the same day it occurred, ICE immediately removed the document from its website and began working to secure the information and notify everyone who was impacted. In addition to letting you know what happened, ICE is taking proactive steps to protect your privacy, including online monitoring for potential re-posting of the document and identifying parties who may have accessed it while it was briefly online. Once this review is complete, ICE will request confirmation from anyone who downloaded the document that they have destroyed it and will not further share it.

Additionally, because the disclosure violated confidentiality obligations under 8 C.F.R. § 208.6 by revealing that you sought protection in the United States, if you are currently subject to a final order of removal, ICE will delay your removal for 30 days. This delay is intended to allow you to determine what actions you wish to take, including consulting with an attorney.

While ICE recognizes that some individuals going through the immigration process already have legal representation, ICE is including a list of free or low-cost legal representatives along with this letter to help those who do not. If you already have an attorney on file with ICE, we will send them a copy of this letter.

ICE deeply regrets that this error occurred and will continue to work to protect the privacy of everyone who was impacted, as well as to prevent similar incidents from happening in the future.

If you have further questions or concerns about this incident, please contact your assigned ICE Enforcement Removal Operations case officer for assistance.

**Notice for Detained Noncitizens Impacted by the Accidental
Information Disclosure on November 28, 2022: Form to opt Out of
Delayed Removal**

**Overview:** U.S. Immigration and Customs Enforcement (ICE) has decided to delay removal from
the United States for 30 days for noncitizens with a final order of removal who were impacted by
the inadvertent information disclosure on November 28, 2022. This delay is intended to allow
such noncitizens time to consult with a legal representative and/or take additional actions related
to their case in light of the information disclosure.

Those who are currently detained in ICE custody will not be removed from the country during
this time period. Because you have been identified as an individual whose information was
inadvertently disclosed, absent action on your part, your removal will not take place for at least 30
days. However, should you NOT wish to have your removal delayed, you may ask that ICE
proceed with arranging your removal by signing the form below. You may take time to review
your options and may sign this letter waiving a delay in removal at any time in the next 30 days.

**Instructions:** The letter explaining the inadvertent disclosure must be given to the noncitizen at
the same time as this form. The information on this page must be read to the noncitizen in a
language that he/she understands.

Name / Nombre: _Cheikh Louis Diakhaté_
A #: _220-969-612_
Country of Citizenship / Pais de Ciudadania: _Senegal_
Detention Facility / El Centro de Detención: _Buffalo Federal Detention center_

_____I do NOT want my removal to be delayed for 30 days, and I am requesting that ICE
proceed with my removal as scheduled.

Signature: _Louis_                                     Date: _1/25/2023_

---

**Certificate of Service**

I hereby certify that this form was served by me at_____
                                                                    (Location)

on _____ on _____, and the contents of this
          (Name of Alien)                    (Date of Service)

notice were read to him or her in the _____language.
                                                      (Language)

_____                    _____
Name and Signature of Officer                Name or Number of Interpreter (if applicable)

_01/25/2023_

KAYCEE LEIGH EVANS
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01EV6413806
Qualified in Genesee County
Commission Expires February 01, 2025

*Enforcement and Removal Operations*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

January 24th, 2023

Cheikh Diakhate
220969612

Cheikh:

**Frequently Asked Questions (FAQs) on U.S. Immigration and Customs Enforcement's Unintentional Disclosure of Personally Identifiable Information:**

**Background:** U.S. Immigration and Customs Enforcement (ICE) quickly implemented a robust response to the unintentional disclosure of personally identifiable information (PII) of noncitizens that occurred in November and December 2022, providing timely notice of the disclosure to the noncitizens and their representatives (as applicable) and taking significant steps to prevent potential harm to the affected noncitizens. As one of the impacted noncitizens, ICE continues to work diligently to ensure you receive the information necessary to make informed decisions regarding your immigration status. The information below is also available at ice.gov/pii.

1. **What happened?**

   On November 28, 2022, while performing routine website updates, U.S. Immigration and Customs Enforcement (ICE) erroneously posted a document to ICE.gov that included names and other personally identifiable information (PII), along with immigration information, of approximately 6,000 noncitizens in ICE custody. Upon notification, ICE took swift action to immediately rectify the error. The information was posted for approximately five hours before being removed.

   On December 7, 2022, the Department of Homeland Security (DHS) notified ICE that during its routine communication with the Government of Cuba related to removal flights, DHS unintentionally indicated that some of the 103 names of individuals previously provided for removal processing were part of the ICE PII disclosure that occurred on November 28.

2. **Which noncitizens were affected by the November 28 and December 7, 2022, inadvertent disclosures?**

   The document that was inadvertently disclosed on November 28 includes certain information pertaining to a number of noncitizens who were in ICE custody as of November 19, 2022. Therefore, if a noncitizen was not in ICE custody as of November 19, 2022, they are not impacted by the November 28 inadvertent disclosure.

The December 7 incident affected 103 individuals; 46 of them were part of the previous ICE PII disclosure of approximately 6,000 individuals and 57 were not. All of these 103 individuals are Cuban.

3. **What is ICE doing to mitigate the possible effect on the noncitizens involved in the November 28 and December 7 inadvertent disclosures?**

   a. Due to the accidental disclosure of information, if impacted noncitizens are subject to a final order of removal, ICE has delayed their removal for at least 30 days. The 30 days will be calculated from the time notification is provided to the noncitizen. The noncitizens who were in custody are being notified of the incident and the removal hold via hand delivery and almost all of those who were not in custody are receiving the notification via USPS.

   b. ICE is in the process of making separate notifications for each incident. Impacted persons and their representatives-of-record will receive or have received a notification packet(s). Almost all individuals impacted by both incidents have now been notified or will be notified imminently.

   c. Notification materials were translated into Spanish and Portuguese for the noncitizens impacted by the November 28 inadvertent disclosure and into Spanish for the noncitizens impacted by the December 7 disclosure. For people in ICE custody, a language translation service is also available to be used to communicate with them about the impact of the disclosure in their language of their choice.

   d. ICE placed alerts in ICE Enforcement and Removal Operations (ERO) and the ICE Office of the Principal Legal Advisor (OPLA) record management systems on all noncitizens whose PII was inadvertently made public. These system notices will help ensure ICE does not remove impacted noncitizens before those individuals have been notified of the unintentional PII disclosure and have an opportunity to update their protection claim should they wish to do so.

4. **What will happen to those noncitizens impacted by the November 28 incident?**
   a. **Those who have POSITIVE credible fear cases?**

      Those with positive credible fear cases are, as a matter of course, placed in removal proceedings and issued Notices to Appear (NTAs). The same holds true for those noncitizens who were impacted by the inadvertent disclosures and found to have credible fear. OPLA will submit written notice of the inadvertent disclosure to the immigration judge and the noncitizen (if pro se) or the noncitizen's legal representative. The noncitizen can apply, or re-apply, for relief or protection based in-part on or entirely on the disclosure(s).

      ERO will conduct custody redeterminations, on a case-by-case basis, to assess whether a detained noncitizen should be paroled from custody or remain detained.

   b. **Those who have NEGATIVE credible or reasonable fear cases?**

Noncitizens who have negative credible or reasonable fear determinations will be issued NTAs and placed in removal proceedings. ERO will also conduct custody redeterminations, on a case-by-case basis, to assess whether the noncitizens should be paroled or otherwise released under appropriate authority while waiting for their removal proceedings or remain detained.

c) **Those already in withholding-only proceedings?**

For noncitizens who received positive reasonable fear determinations who are placed into withholding-only proceedings, OPLA will move to dismiss the proceedings to allow ERO to cancel the reinstatement order and issue an NTA. ERO will also conduct custody redeterminations, on a case-by-case basis, to assess whether the noncitizens may be released or remain detained.

d. **Those in removal proceedings or who have an appeal pending before the Board of Immigration Appeals (BIA)?**

   i.    In immigration court, OPLA will submit written notice of the inadvertent disclosure to the immigration judge and the noncitizen (if pro se) or the noncitizen's legal representative. The noncitizen may apply, or add to a currently pending application, for relief or protection based in-part or entirely on the disclosure.

   ii.   If the noncitizen has a pending appeal before the Board of Immigration Appeals (BIA), OPLA will submit written notice of the disclosure to the BIA and the noncitizen (if pro se) or the noncitizen's legal representative. The noncitizen may apply, or add to a currently pending application, for relief or protection based in-part or entirely on the disclosure.

   iii.  OPLA will not oppose motions to remand for further proceedings that are filed due to the disclosure. For cases in which there is a pending DHS appeal, OPLA will consider whether continued pursuit of the appeal is warranted and will file a motion to withdraw if appropriate.

e. **Those with an UNEXECUTED Order of Removal?**

Whether before the immigration court or BIA, OPLA will not oppose motion to reopen to apply (or re-apply) for a protection-based application filed by a noncitizen or his or her legal representative that is based on the inadvertent disclosure(s). For a noncitizen who is numerically or time barred from filing a motion to reopen, OPLA will agree to filing a joint motion to reopen if the motion is based on the inadvertent disclosure(s).

f. **Those with an EXECUTED Order of Removal?**

If a noncitizen is represented, ICE will contact the representative of record to advise that, upon request, it will place the noncitizen previously subject to an expedited removal or reinstatement order in § 240 of the Immigration and

Nationality Act (INA) removal proceedings upon the noncitizen's return to the United States. For noncitizens previously removed under an INA § 240 removal order, ICE will reopen the proceedings on request when the basis for the request is the inadvertent disclosure(s). For cases in which a decision has been made to return the noncitizen to the United States, ICE will facilitate the noncitizen's return.

If the noncitizen is pro se, ICE will place an alert in its systems, and will coordinate with U.S. Customs and Border Protection (CBP) to do the same, to ensure that such a noncitizen is placed in INA § 240 removal proceedings during the next encounter of the noncitizen, if any.

5. **What will happen to those noncitizens impacted by the December 7 incident?**
ICE is conducting custody redeterminations on a case-by-case basis to evaluate whether an individual may be released from custody. Depending on each case's procedural posture, ICE will process noncitizens impacted by the December 7, 2022 incident consistent with the procedures available to noncitizens impacted by the November 28, 2022 incident discussed in Section 4.

6. **Will the initial pause of 30 days be extended?**

Yes. Now that ICE is implementing options to help remedy the inadvertent disclosure, we are extending the 30-day pause on removals for the impacted noncitizens to allow them time to further discuss their options with a legal representative.

7. **What else is ICE doing to mitigate the impact of the November 28 disclosure?**

ICE continues to monitor the internet to identify whether the PII is being improperly posted or publicly disseminated. OPLA has sent, and will continue to do so as necessary, "clawback" letters to all identified external entities or individuals that may have downloaded, received, or accessed the document. The "clawback" letters ask those entities or individuals to destroy the document and refrain from using or disclosing the information contained in the disclosure.

8. **What is ICE doing to prevent this sort of privacy spill from happening in the future?**

Though unintentional, this release of information is a breach of policy. The agency is investigating the November 28 incident and taking all corrective actions necessary to prevent any similar incident from occurring again. The incident continues to be under review by ICE's Office of Professional Responsibility (OPR) and Office of the Chief Information Officer (OCIO). Consistent with policy, ICE notified the DHS Chief Privacy Officer and other DHS oversight bodies of the accidental disclosure of PII.
The December 7 incident originated from DHS, which is handling any additional mitigation and corrective measures as necessary.

9. **Has ICE notified EOIR and USCIS?**

Yes. ICE notified the Executive Office for Immigration Review (EOIR) and U.S. Citizens and Immigration Services (USCIS) of the accidental disclosure of PII.

Signature: _____

Date: _____1-26-23_____

---

**Certificate of Service**

I hereby certify that this form was served by me at ___BFDF_____

on __Cheikh  Diakhate__ on __1-26-23__ (Location)

(Name of Alien)          (Date of Service)        , and the contents of this

notice were read to him or her in the ___English_____ language.

__Sean McDonald__  _____

Name and Signature of Officer          Name or Number of Interpreter (if applicable)

# List of Pro Bono Legal Service Providers

Updated January 2023

http://www.justice.gov/eoir/list-pro-bono-legal-service-providers

## Buffalo & Batavia Immigration Courts

| Buffalo & Batavia, New York (page 2 of 2) | |
|---|---|
| **Frank H. Hiscock Legal Aid Society***<br><br>351 South Warren Street, Floor 3<br>Syracuse, NY 13202<br>Tel: (315) 422-8191<br>Mail@hlalaw.org<br>https://www.hlalaw.org<br><br>• Please call for an appointment<br>• Representation limited to residents of Cayuga, Cortland, Madison, Onondaga, Oswego, Clinton, Essex, Franklin, Hamilton Jefferson, Lewis, St. Lawrence, Fulton, Montgomery, Otsego, Schoharie, Herkimer, and Oneida.<br>• Representation of detention cases is limited to Clinton County Jail in Plattsburgh, NY | |

Individuals must contact the providers on this list directly to request legal services. Although the providers on this list offer pro bono (free) legal representation, they may not have the capacity at this time to accept new cases.

**Disclaimer:** As required by 8 C.F.R. § 1003.61, the Executive Office for Immigration Review (EOIR), Office of the Director, maintains a list of organizations and attorneys qualified under the regulations who provide pro bono or free legal services. The information posted on the list is provided to EOIR by the Providers. EOIR does not endorse any of these organizations or attorneys. Additionally, EOIR does not participate in, nor is it responsible for, the representation decisions or performance of the organizations or attorneys.

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Cheikh Diakhate

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS

Jeffrey Searls

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☒ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____



FOREVER USA
PURPLE HEART

FOREVER USA
PURPLE HEART

Buffalo Federal Detention Facility

BATAVIA NY
14 DEC 2023 PM

USDC-WDNY
DEC 27 2023
ROCHESTER

To Kenneth B. Keating

Federal Building

100 State Street Room 2120

Rochester, New York 14614

Otolleh Loous Diokhoi

Alien Number 290-969-682

4250 Federal Drive (BFDF)

Batavia New York 14020